IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

UNITED STATES OF AMERICA,

v.  :  CIVIL ACTION NO.: CR212-001

RODERICK BURROWS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Defendant Roderick Burrows ("Defendant") has been charged in a five-count indictment with: possession of false identification documents, in violation of 18 U.S.C. § 1028(a)(3); possession of unauthorized access devices, in violation of 18 U.S.C. § 1029(a)(3); possession of access device-making equipment, in violation of 18 U.S.C. § 1029(a)(4); and aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1). Defendant filed a Motion to Suppress, to which the Government filed a Response. The undersigned conducted an evidentiary hearing on June 19, 2012, at which William Woolard, Cedric Brown, and William Griffin testified. The parties filed post-hearing briefs.

### FINDINGS OF FACT

The credible testimony at the evidentiary hearing establishes the following:

During the morning hours of November 21, 2011, Deputy Sheriff William Woolard ("Woolard") with the Camden County Sheriff's Department was on patrol on Interstate 95 when he noticed the driver of a white Chrysler Town and Country van commit a

AO 72A
(Rev. 8/82)

traffic violation. Specifically, Woolard noticed the driver of the van failed to maintain his lane of travel, meaning that the driver went over the striped lines on either side of the vehicle without using a turn signal. Woolard initiated a traffic stop by activating his blue lights, which, in turn, activated Woolard's dashboard camera. After the driver and Woolard pulled to the side of the road, Woolard approached the car and asked the driver, who was the Defendant, for his driver's license. Defendant told Woolard that the van was a rental. Defendant could not produce a copy of the rental agreement but stated that his then-absent girlfriend was the one who rented the van. Woolard asked Defendant if he had been drinking or had taken any medications, and Defendant said he had not. Woolard testified that he told Defendant he was pulled over for failure to maintain his lane and because he noticed Defendant was on his cell phone, leaning back in the van. According to Woolard, Defendant was "extremely nervous[ ]", his hands were "visibly shaking[ ]", and he would avoid eye contact when Woolard asked questions. (Doc. No. 44, p. 11). Woolard asked Defendant where he was coming from and to where he was going. Defendant replied that he was coming from North Carolina and going to St. Augustine, Florida, to play poker and had "accidentally" ended up in Atlanta and stayed there a couple of nights with a friend, for whom he could only remember a first name. (Id. at p. 13). Defendant told Woolard that he had stayed at a Hilton the night before which was a "couple [of] hours up the road[ ]", but he could not remember the interstate exit or the name of the town. Woolard testified that, although he thought Defendant might have been involved in criminal activity, he told Defendant he was going to be written a warning citation. Woolard went back to his car to get his warning book, and, as he was writing the warning citation, he continued speaking to

2

Defendant. Woolard stated that Defendant was still acting nervously. Woolard stated that, once a person realizes he is only receiving a warning, he will become calmer, but Defendant did not. Woolard then asked Defendant for consent to search the van, and Defendant told Woolard he could not. At that point, Woolard signaled another officer, Sergeant Cedric Brown ("Brown"), to have his police dog, Chacal, conduct an open-air sniff. Woolard testified that Chacal alerted to the presence of contraband in the van, and Woolard and Brown searched the van. The officers' search uncovered false driver's licenses, credit cards, a laptop, and a reader-writer scanner. After the officers found false driver's licenses, they both approached Defendant and handcuffed him. The laptop recovered from the search was turned over to the United States Secret Service, and a forensic examination was performed after Special Agent William Griffin ("Griffin") obtained a search warrant.

Defendant asserts that all of the evidence obtained as a result of the traffic stop on November 21, 2011, should be suppressed for five (5) reasons. First, Defendant contends that Woolard lacked probable cause to stop him for failure to maintain his lane. Defendant also contends that Woolard unduly expanded the scope and duration of the traffic stop by questioning Defendant, delaying issuing the citation, and calling a drug dog because Defendant did not consent to a search. Defendant asserts that the drug dog employed was not sufficiently reliable. Defendant alleges that Woolard asked Defendant a number of incriminating questions after he was handcuffed, and Woolard did not advise Defendant of his rights. Finally, Defendant asserts that there was an unreasonable delay in obtaining the search warrant for his computer.

AO 72A
(Rev. 8/82)

# DISCUSSION AND CITATION TO AUTHORITY

I. **Traffic Stop**

Defendant contends that Woolard's stop of him was not based on probable cause. Defendant asserts that Woolard stopped him for weaving in a single lane, which does not violate Georgia law.

A traffic stop is reasonable, and therefore constitutional, if the officer conducting the stop "has probable cause to believe that a traffic violation has occurred[.]" United States v. Harris, 526 F.3d 1334, 1337 (11th Cir. 2008). "To determine whether the officer had probable cause, we do not focus on the officer's subjective motives; rather, we focus on whether the circumstances, viewed objectively, justified the stop." United States v. Harrelson, 465 F. App'x 866, 868 (11th Cir. 2012) (citing Whren v. United States, 517 U.S. 806, 812-13 (1996)). Whren dispensed with the pretextual stop analysis, i.e., "the reasonableness of a traffic stop is determined irrespective of the officer's intentions." Id.

While the DVD of the traffic stop does not depict the van Defendant was driving weaving into another lane, this is not determinative of whether Woolard had probable cause to stop Defendant based on a violation of Georgia law. Woolard testified that he saw Defendant fail "to maintain his lane of travel[ ]" by "going over the lane on either side of the vehicle." (Doc. No. 44, pp. 7, 9). After seeing this, Woolard turned on his blue lights, which, in turn, activated his video camera recording system. Woolard initiated a traffic stop based on Defendant's failure to maintain his lane, in violation of

4

O.C.G.A. § 40-6-48.[1] Even if the traffic violation was not captured on Woolard's video camera recording system, there is no evidence before the Court which contradicts Woolard's testimony that he saw a traffic violation and that his camera was not activated until after this observation. Woolard had probable cause to initiate a traffic stop.

II.  **Duration and Scope of Traffic Stop**

Defendant alleges that Woolard prolonged the traffic stop well beyond what was necessary to write a citation, called a drug dog over to perform an air-sniff as retaliation for Defendant's refusal to consent to a search, and lacked reasonable suspicion of any illegal activity other than a traffic violation. Defendant also alleges that Woolard did not limit his questions to Defendant's license, registration, and insurance, but rather asked a series of wide-ranging questions, such as Defendant's lack of employment, his route of travel, and whether Defendant had any illegal substances in the van. Defendant asserts that Woolard had not requested the dispatcher to run a criminal history or license check on him, and there is nothing of record which indicates Woolard requested a record check of any kind. Defendant maintains that Woolard's questions had nothing to do with whether Defendant properly maintained his lane. Defendant also maintains that Woolard's writing of the citation was "interrupted only by his incessant questioning . . . on matters unrelated to the traffic stop." (Doc. No. 21, p. 13).

"The right of the people to be secure in their persons . . . and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. CONST. amend. IV. A seizure occurs "'whenever a police officer accosts an individual and restrains his freedom to walk away.'" United States v. Perkins, 348 F.3d 965, 969 (11th Cir. 2003)

---

[1] "A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety[.]" O.C.G.A. § 40-6-48(1).

(quoting United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975)). At least "three separate categories of police-citizen encounters in determining which level of Fourth Amendment scrutiny to apply" have been identified by the Supreme Court: "(1) brief, consensual and non-coercive interactions" which do not implicate a Fourth Amendment analysis; "(2) legitimate and restrained investigative stops short of arrests to which limited Fourth Amendment scrutiny is applied . . .; and (3) technical arrests, full-blown searches or custodial detentions that lead to a stricter form of Fourth Amendment scrutiny." Id. (internal citations omitted). The case *sub judice* involves the second type of encounter, and thus, requires analysis under Terry v. Ohio, 392 U.S. 1 (1968).

Terry requires that "an officer's investigation of a traffic stop . . . be 'reasonably related in scope to the circumstances which justified the interference in the first place.'" United States v. Boyce, 351 F.3d 1102, 1106 (11th Cir. 2003) (quoting Terry, 392 U.S. at 20). Additionally, "the traffic stop must be of a limited duration. The stop 'may not last any longer than necessary to process the traffic violation *unless* there is' reasonable and 'articulable suspicion of other illegal activity.'" Id. (quoting United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001) (emphasis supplied).

Reasonable suspicion requires that the officer "'be able to point to specific and articulable facts which, taken together with reasonable inferences from those facts, reasonably warrant that intrusion.'" Boyce, 351 F.3d at 1107. The totality of the circumstances determines what reasonable suspicion is "such that, while some individual factors may be consistent with innocent travel[,] they can also, when taken together, give rise to a reasonable suspicion." Id. (internal citation and punctuation omitted). However, "reasonable suspicion must be more than an inchoate hunch, and

6

the Fourth Amendment accordingly requires that police articulate some minimal, objective justification for an investigatory stop." Id.

Woolard testified that, after he had Defendant step out of the van, he noticed Defendant was "extremely nervous." (Doc. No. 44, p. 11). Woolard also testified that Defendant's hands were "visibly shaking[,]" and when Woolard asked Defendant questions, he "would avoid eye contact[ ]" and "wouldn't look at [him] when he gave answers." (Id.). Woolard noted that, based on his experience and training, shaking hands and the failure to maintain eye contact are indicators of deception and of criminal activity. Woolard also noted that he asked Defendant other questions based on the observations Woolard made. Woolard stated that Defendant informed him that he was coming from North Carolina and travelling to St. Augustine, Florida, to play poker. Woolard testified that Defendant told him that he accidentally ended up in Atlanta, Georgia, and stayed with a friend (for whom he only had a first name) for a couple of nights and had stayed in a Hilton hotel a couple of hours up the road the night before the traffic stop. However, Woolard noted that Defendant did not know the name of the town in which he stayed or at which exit the hotel was. Woolard testified that Defendant's travel plans and observations about Defendant's demeanor led Woolard to believe "there was . . . criminal activity going on besides what [Defendant] was telling [him]." (Id. at p. 14). Despite this, Woolard stated he told Defendant he was going to give him a warning. Woolard also stated that he noticed Defendant "was still extremely nervous[ ]", even though most people will stop "their shaking and nervousness" once they know they are getting a warning.[2] (Id.).

---

[2] During the hearing, the Assistant United States Attorney ("AUSA") inquired of Woolard why he asked Defendant for consent to search the van. Woolard stated Defendant's answers to his questions and his

7

Several reviews of the DVD presented during the evidentiary hearing lend support to Woolard's testimonial account of the events of November 21, 2011.[3] After Defendant and Woolard were pulled onto the shoulder of the interstate, Woolard approached the driver's side of the van and asked Defendant a few questions. Woolard and Defendant walked to the back of the van and in front of Woolard's patrol car at approximately the two-minute mark of the DVD. Woolard continued questioning Defendant and asked him why his girlfriend rented the van for him. Defendant stated she rented it for him because she had a credit card and that she probably had the rental agreement in her purse. (Exh. 1, 2:25). Woolard asked Defendant where he was going, and Defendant told him to St. Augustine to play poker. (Id. at 3:08). The two men talked about poker and Defendant's travel for a few moments. Then, Woolard went to his patrol car to get his warning citation book. (Id. at 5:00). Defendant was looking around during this three-minute period. While the undersigned did not notice Defendant's hands shaking at any point, Woolard testified during cross-examination that this behavior could not be seen on the DVD. (Doc. No. 44, p. 29). Woolard began writing the citation to Defendant, (Exh. 1, 5:30), and approximately two (2) minutes later, it appears that Woolard's pen is at the bottom of the citation page. (Id. at 7:40). During this time, Woolard alternated between asking Defendant questions while continuing to write the citation and not writing it. However, Woolard's pen looked as though it went

---

nervousness. The AUSA then asked, "And the lack of the rental agreement?". (Doc. No. 44, p. 15). Defendant's attorney objected to this question as leading, which the undersigned sustained. The AUSA did not rephrase her question or otherwise ask this question again.

[3] The undersigned's ability to hear the audio portions of the exchanges between Defendant and Woolard was hampered due to excessive background noises in the DVD. However, the undersigned's reviews (of which there were several) of the DVD were largely (though not entirely) for the purpose of looking at Defendant's demeanor during the course of the traffic stop.

back to the middle of the page of the citation, presumably while he was writing down the license plate and make and model of the van. When Woolard asked Defendant if he had any illegal substances in the van, Defendant continued looking around, albeit not as much as he did earlier. Woolard continued asking Defendant questions and writing the citation even after giving Brown the circular motion for Chacal to perform an air sniff. Woolard did not give Defendant the citation.

Woolard articulated several instances during his stop of Defendant which lead to the conclusion that Woolard had reasonable suspicion of criminal activity. First, Woolard stated that Defendant was extremely nervous and his hands were shaking. Admittedly, the undersigned did not notice Defendant's hands were shaking, but the undersigned had the benefit of several viewings of the DVD and hindsight, whereas Woolard did not. Woolard was also in a better vantage point to observe Defendant, as he testified that he was only a foot and a half to two (1½ to 2) feet away from Defendant. In addition, Defendant looked around quite a bit during this stop, whether at traffic on the interstate, over Woolard's head, or even at Woolard. Moreover, Defendant's explanation that he ended up in Atlanta by "accident", stayed with a friend he did not know the last name of despite knowing the friend for about two (2) years, and that he had stayed at an unidentified Hilton hotel the night before was bizarre. While on an individual basis each of these things may not be suspicious, the totality of the circumstances supports Woolard's reasonable suspicion that criminal activity beyond Defendant's failure to maintain his lane was afoot.

The duration of this traffic stop was not unduly long, either, as Woolard's signal to Brown for a search was made approximately ten (10) minutes into the stop. <u>United</u>

States v. Wilbur, 458 F. App'x 829, 830 (11th Cir. 2012) (citing Illinois v. Caballes, 543 U.S. 405, 409 (2005), for the proposition that arrival of the canine unit within ten to fifteen minutes of a traffic stop while another officer was completing a background search and writing a citation did not prolong the stop unreasonably). Because an individual's privacy interest in a car on a public road is reduced, "[t]he use of drug-sniffing dogs on the exterior of a car is not a search." Merrett v. Moore, 58 F.3d 1547, 1553 n.11 (11th Cir. 1995). "A warrantless search and seizure of a car is permissible when the police have probable cause to believe the car contains contraband." United States v. Virden, 488 F.3d 1317, 1321 (11th Cir. 2007). "In the case of dog sniffs, 'probable cause arises when a drug-trained canine alerts to drugs.'" United States v. Nelson, 309 F. App'x 373, 375 (11th Cir. 2009) (quoting United States v. Banks, 3 F.3d 399, 402 (11th Cir. 1993)). Once Chacal alerted for the presence of contraband, Brown had probable cause to search the interior of the van.[4]

This case is distinguishable from Boyce, which Defendant cites. In Boyce, the Eleventh Circuit determined that the police officer called the drug dog after the defendant refused to allow a search and that officers cannot consider a person's refusal to search as a basis for prolonging a search in the absence of reasonable suspicion. 351 F.3d at 1110-11. As detailed above, Woolard signaled Brown to conduct an air sniff after Defendant refused to give consent, which was *after* Woolard gained reasonable suspicion of criminal activity. Boyce, 351 F.3d at 1110 (a defendant's refusal to allow a search of a vehicle can be considered when the officer has already observed, before

---

[4] The undersigned reaffirms his concerns that a canine's ability to detect the residual odor of drugs may subject anyone and everyone to a search of his vehicle. However, the parties were unable to point to any relevant case law regarding situations involving a rental vehicle, the use of a canine to perform an air sniff, and an alert on the existence of what could be the residual odor of drugs.

seeking consent to search, facts sufficient to raise a reasonable suspicion of criminal activity).

## III. Incriminating Statements

Defendant contends that he was placed in handcuffs and was thus, in custody. Defendant also contends that he was not given his Miranda rights, yet Woolard and Brown questioned him. Defendant contends that any statement he made after being handcuffed and not given his Miranda rights should be suppressed.

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards[5] effective to secure the privilege against self-incrimination." Miranda v. Arizona, 384 U.S. 436, 444 (1966). Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. The circumstances of each case dictate "whether there is a restraint on the suspect's freedom of movement 'of the degree associated with a formal arrest.'" United States v. Phillips, 812 F.2d 1355, 1360 (11th Cir. 1987) (quoting Minnesota v. Murphy, 465 U.S. 420, 430 (1984)).

The Government agrees that Defendant was under arrest at the time officers asked questions relating to the fake driver's licenses found during the search of the van. The Government also agrees that this questioning was done without benefit of Miranda warnings, and any statements Defendant made as a result should be suppressed. The

---

[5] "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Miranda, 384 U.S. at 444.

11

undersigned agrees. This portion of Defendant's Motion should be granted. Any statements Defendant may have made after he was handcuffed (and arrested) should not be used against Defendant during the trial of this case.[6]

IV. **Reliability of Drug Dog**

Defendant asserts that the drug dog, Chacal, was not reliable and disputes that Chacal alerted to the presence of contraband inside the van Defendant was driving. Defendant alleges that, though Chacal was trained to detect marijuana, cocaine, ecstacy, heroin, and MDMA, these substances were not recovered during the search of the van. Defendant also alleges that Chacal served "as a search warrant on a leash[ ]" because he was trained to detect residual odors, which could have resulted from the presence of drugs in the rental van a week or more before this search. (Doc. No. 45, p. 3). Defendant asserts that there is no evidence that Chacal was reliable or well trained.

A dog sniff must be sufficiently reliable in order to establish probable cause, and this reliability is generally present if the dog is "well-trained." Caballes, 543 U.S. at 409; United States v. Smith, 448 F. App'x 936, 939 (11th Cir. 2011) (noting that the Eleventh Circuit has "long recognized that probable cause arises when a drug-trained canine alerts to drugs, even in the absence of other evidence."). Evidence of a dog's training is sufficient proof of reliability. United States v. Sentovich, 677 F.2d 834, 838 n.8 (11th Cir. 1982).

Sergeant Brown, Chacal's human partner, testified that he was taught to learn canine behavior when the dog detects the odor of narcotics, including the dog's body

---

[6] The Government contends that Defendant's statements may have been legally involuntary but were not physically involuntary. Thus, the Government avers, these statements may be used against Defendant as impeachment evidence, should Defendant testify during trial. The undersigned offers no opinion as to the Government's assertion.

AO 72A
(Rev. 8/82)

posture and movement. Brown also testified that he completed the North American Police Work Dog Association ("NAPWDA") training, which is a canine handler school, and that he had worked with canines for 15 years. (Doc. No. 44, pp. 46-47). Brown stated that he and Chacal completed a NAPWDA certification course in June 2011. As a result, Chacal passed the course for narcotics detection and police utility dog. Brown declared that he and Chacal trained for the Camden County Sheriff's Department twice every month, which includes hiding each of the drugs on which Chacal is trained and having Chacal alert on the presence of these drugs, as well as the residual odors of these drugs. (Id. at pp. 49-50). Brown testified that he kept a training log, which included the location, date and time, the drug(s) hidden, and whether Chacal properly alerted to the presence of drugs.[7] Brown testified that, if Chacal detects the presence of drugs, he will bark and sit at the place where the odor is strongest. (Id. at p. 53). Chacal made a positive alert to the van, and Brown searched the van. Though no drugs were found, officers found false driver's licenses and credit cards, as well as other paraphernalia associated with fraudulent activity.

The evidence before the Court indicates that Chacal was trained to detect contraband. Based on Chacal's training, he is sufficiently reliable, and there is no evidence of record to the contrary.

## V. Unreasonable Delay in Obtaining a Search Warrant

Finally, Defendant contends that officers seized a laptop during the search of the rental van on November 21, 2011, and the laptop was in the possession of the United States Secret Service no later than the next day. However, Defendant contends, Agent

---

[7] Brown testified that Chacal ate the training log, and thus, the log was not produced. However, there was no evidence presented that contradicted the former existence of this log.

13

William Griffin did not apply for a search warrant until December 8, 2011, which was 17 days after the seizure. Defendant contends that this delay was unreasonable.

"Seizure of a container, pending issuance of a warrant to examine its contents, is permitted where there is (1) probable cause to believe that it holds contraband or evidence of a crime and (2) if the 'exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present.'" United States v. Vallimont, 378 F. App'x 972, 974 (11th Cir. 2010) (quoting United States v. Place, 462 U.S. 696, 701 (1983)). "Probable cause exists when under the totality of the circumstances there is a fair probability that contraband or evidence of a crime will be found in a particular place." Id. (internal citation omitted). "[A] seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on unreasonable searches." United States v. Mitchell, 565 F.3d 1347, 1350 (11th Cir. 2009) (internal punctuation and citation omitted). "Thus, even a seizure based on probable cause is unconstitutional if [there is an] unreasonable delay in securing a warrant." Id. The reasonableness of the delay is determined "in light of all the facts and circumstances, and on a case-by-case basis." Id. at 1351. "[T]he reasonableness determination will reflect a careful balancing of governmental and private interests." Id. (alteration in original).

Griffin testified that he received Defendant's laptop on November 21, 2011, the date of the traffic stop. Griffin also testified that he attempted to get Defendant to cooperate with his investigation, as Secret Service agents like to do, and visited him at the jail, but Defendant invoked his Miranda rights. Griffin stated that, the next day, he

ran all 30 credit cards through the "Secret Service card reader[,]" which agents use to determine whether the numbers appearing on a credit card match the numbers revealed from the magnetic strip. (Doc. No. 44, p. 73). Griffin noted that the week of the traffic stop was the week of Thanksgiving, and he knew he was the only one of the four agents in the Savannah office during that week. Griffin also noted that Special Agent David Johnson was the only agent in the Savannah office who had the ability and training to perform a forensic evaluation of the computer. Griffin stated that the most important thing for him to determine was whether the credit cards recovered during the search had been reprogrammed because Defendant had every tool he needed to do so. In trying to determine this, Griffin stated that he used an e-library system in an attempt to identify the legitimate bank holders of the credit cards. Griffin testified that an embossed credit card number may have been issued by U.S. Bank, but the magnetic strip number belonged to Wells Fargo (as an example), which led him to believe he had probable cause to search Defendant's computer. Griffin noted that he wrote his affidavit in support of his application for search warrant after he gathered all of the facts and submitted his affidavit and application to the Assistant United States Attorney on December 1, 2011. Griffin also stated that he was scheduled to present Magistrate Judge G. R. Smith with his affidavit and application on December 5, 2011, but that appointment was rescheduled for December 8, 2011, at which time Judge Smith signed the search warrant. Griffin further stated that he continued his investigation during this time in an effort to learn who the victims of any fraudulent transactions may be. Griffin testified that he had other duties and cases to tend to during the time of his investigation in this case, including rotation as a supervisor in the office. (Id. at pp. 75-78).

AO 72A
(Rev. 8/82)

Approximately one week after Judge Smith signed the search warrant, the forensics evaluation was performed.

The case is distinguishable from Mitchell. In Mitchell, the Eleventh Circuit determined a three-week delay in seeking a search warrant for a computer's hard drive was unreasonable in the circumstances presented because: the agent did not "see any urgency" in obtaining the search warrant because the defendant admitted there was child pornography on his computer; the agent attended a training program, which may have been able to be postponed, during this delay; and the agent did not ask another agent who was familiar with the case and had similar qualifications for assistance. 565 F.3d at 1351-53.

In consideration of the circumstances presented in this case, the undersigned concludes that the 17-day delay in obtaining a search warrant was reasonable. Woolard's stop of Defendant occurred on November 21, 2011, which was the week of Thanksgiving (which was November 24, 2011). Griffin was the only Secret Service agent working in the Savannah office during that time. Nevertheless, just one week after Thanksgiving, Griffin was able to prepare his affidavit in support of the application for search warrant and present it to the United States Attorney's Office. Griffin had an appointment with Judge Smith four (4) days later, or December 5, 2011, which was postponed until December 8, 2011. During these 17 days, Griffin had to divert his attention to other pending cases and duties, including serving as the office supervisor. Additionally, Griffin continued his investigation of this case during that time, as well. The 17-day delay in obtaining a search warrant was reasonable under the Fourth Amendment.

AO 72A
(Rev. 8/82)

## CONCLUSION

Based on the foregoing, it is my **RECOMMENDATION** that Defendant's Motion to Suppress be **GRANTED** in part and **DENIED** in part. The Government should not be entitled to use any statements Defendant made after he was arrested. Otherwise, the Government should be entitled to use all other evidence obtained during the November 21, 2011, traffic stop.

**SO REPORTED** and **RECOMMENDED**, this 15th day of August, 2012.

JAMES E. GRAHAM
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev. 8/82)